UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Crim. No. 04-76-B-W |
| ) | |
| JOSHUA D. GABRIEL, ) | |
| ) | |
| Defendant. ) | |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**
**(DOCKET NO. 28)**

Joshua D. Gabriel is charged in an indictment with possession of marijuana with intent to distribute and for forfeiture of a Rolex watch and $4,060 cash. Gabriel has moved to suppress the marijuana, which was discovered in his motor vehicle during a search that occurred at a checkpoint being conducted by the U.S. Border Patrol (and that was attended by state and county law enforcement agencies) at a weigh station near mile marker 199 on Interstate 95. Gabriel maintains that the checkpoint was not a valid immigration checkpoint but an unconstitutional roadblock akin to the roadblock declared unlawful by the Supreme Court in City of Indianapolis v. Edmond, 531 U.S. 32 (2000). I recommend that the court GRANT Gabriel's motion.

**Proposed Findings of Fact**

On March 9, 2005, I conducted a testimonial hearing on Gabriel's motion. The Government presented testimony from Border Patrol Agent Kai Libby, who served as the patrol agent in charge of the checkpoint in question, and from Border Patrol Agent Shelton Keehn, the "secondary inspection" agent who conducted the search in question. In addition, the Government presented a stipulation, signed by the defendant, concerning

the testimony of Border Patrol Agent Christopher McGrath,[1] the "primary inspection" agent who first questioned Gabriel and directed him to drive his vehicle into the weigh station for secondary inspection.  I also heard testimony from Gabriel, who briefly took the stand in an effort to generate a factual dispute concerning the Government's contention that he consented to a search of his vehicle.  I begin my recounting with a description of the checkpoint before turning to Gabriel's personal encounter with it.

On September 2, 2004, the U.S. Border Patrol conducted an immigration checkpoint[2] adjacent to a truck weigh station located near mile marker 199 on the southbound lane of Interstate 95, a short distance south of the common municipal boundary of Alton and Old Town (the "Old Town Checkpoint").  The checkpoint was positioned, as the crow flies, approximately 74 miles from the Vanceboro, 91 miles from the Houlton, 100 miles from the Jackman, 76 miles from the Calais and 85 miles from the Lubec points-of-entry from Canada.  Of these various points-of-entry, travelers entering the United States through the Vanceboro and Houlton points-of-entry and traveling to points south would likely pass through the Old Town checkpoint, which gathers up southbound traffic coming from Route 6 out of Vanceboro and from Route 2 and 2A out of Houlton.[3]

As for the selection of the Old Town location for the checkpoint, Agent Libby testified that the location was moved from Sidney, a town roughly 80 miles south of Old

---

[1] Agent McGrath was unavailable because of his attendance at a training assignment in New Mexico.

[2] Although I use the term "checkpoint," I do not mean to suggest that this checkpoint was anything other than a roadblock.  The Government's position appears to be that if a roadblock is called an "immigration checkpoint" it becomes an "immigration checkpoint."  I am not convinced it is that simple.  "Painting a pumpkin green and calling it a watermelon will not render its contents sweet and juicy." Arruda v. Sears, 310 F.3d 13, 24 (1st Cir. 2002).

[3] The Government's introduction of testimony concerning the distance of the Old Town Checkpoint from various points-of-entry appears to have been offered exclusively to demonstrate that the checkpoint was within 100 miles of various points-of-entry.

Town, because of high traffic volume and the need there to use a highway rest area for secondary inspection, which "caused problems."  Other locations considered included a location in Medway.  That location was rejected, however, because traffic backed-up by the checkpoint would come to rest on an overpass and the secondary inspection area would have to be located in a rest area that would not be visible from the primary inspection area.[4]  Agent Libby's testimony, which I credit, reflects that the Old Town location was preferable to alternative locations in Sidney and Medway.  The only testimony concerning why Border Patrol considers it necessary to conduct any immigration checkpoint at all within the interior of this state is that the Border Patrol tries to have the checkpoint coincide with migrant workers leaving the area.

Border Patrol refers to the Old Town Checkpoint as a "permanent but part-time" checkpoint.  Whatever label one attaches to the checkpoint, Border Patrol conducted the checkpoint on only two days in 2004.  The Government did not introduce any evidence concerning the effectiveness of the checkpoint in apprehending illegal immigrants.  Nor could Agent Libby testify to any statistics related to the checkpoint's effectiveness when I asked him whether he had such information.  The only evidence that arose concerning the checkpoint's relative effectiveness was a statement by Agent Keehn on cross-examination that the checkpoint produces more "incidental" arrests than immigration-related arrests.

As for the layout of the checkpoint, Agent Libby testified that cars were stopped in their lanes by border patrol agents stationed in the roadway (one for each of the two

---

[4] Agent Libby testified that the choice of the Old Town location was made by Chief Agent Stanley Spencer, the head of the Houlton sector, a position now held by Robert Gilbert, and that no agent with lesser rank than sector chief has the authority to designate an area for an immigration checkpoint.  The sector chief assigned to Agent Libby responsibility for setting up the checkpoint.

3

southbound travel lanes) just north of the turn off for the truck weigh station.[5] The place where these two agents were positioned to stop and speak with motorists was described by Agent Libby as the "primary inspection area." Some distance north of those agents, another agent was stationed at the cross-over between I-95's southbound and northbound lanes, strategically positioned to prevent motorists from using the cross-over to avoid inspection at the checkpoint. Just south of the primary inspection area and approximately 200 yards away, another 5 or 6 border patrol agents and a drug-sniffing canine were stationed at the offroad weigh station, within eyesight of the primary inspection area. The agents working within the weigh station made up the "secondary inspection area." Also present at the secondary inspection area that day were an undisclosed number of Maine state and county law enforcement officers.

The agents positioned at the primary inspection area either wave motorists through the checkpoint or stop and question them about their immigration status, depending on the circumstances. Should questioning generate a concern, the agent conducting primary inspection may direct the motorist to drive into the weigh station for secondary inspection.

At roughly 11:40 a.m. on September 2, 2004, Agent Christopher McGrath stopped and spoke with the driver of a blue Chrysler Pacifica bearing New Jersey plates being driven by the defendant. After identifying himself as a U.S. Border Patrol Agent, Agent McGrath inquired as to Gabriel's citizenship. Agent McGrath also observed two very large hockey bags in the rear passenger area of the vehicle. Based on the fact of

---

[5] Agent Libby offered additional testimony about the layout of border patrol vehicles, signs, cones and the like, and the Government introduced a diagram of the primary inspection area (Gov't Ex. 3). None of those details appears to be in any way material to the pending motion except to establish that the checkpoint was conducted according to governmental safety procedures.

Gabriel's Canadian citizenship and the presence of the hockey bags, Agent McGrath referred Gabriel to the secondary inspection area for further inspection.

According to Agent Shelton Keehn, Agent McGrath radioed the secondary inspection area and indicated that the blue Chrysler was referred for a "document check and canine sniff." Agent Keehn then directed Gabriel where to stop his vehicle and spoke with Gabriel through the open driver's side window. Agent Keehn asked Gabriel his citizenship, to which Gabriel indicated that he was Canadian. Keehn then asked to see Gabriel's identification. Gabriel produced a Canadian driver's license. Keehn testified that about this time he observed a hockey bag in the back of the vehicle. Keehn then asked Gabriel where he was coming from. Gabriel responded that he had come from the University of Maine at Presque Isle. As to his purpose for being there, Gabriel indicated that he had been checking out the university. According to Keehn, he found this response to be strange because school had already started. Also according to Keehn, Gabriel seemed "kinda nervous." Keehn also observed that the hockey bag had grass stains on it, which he considered strange for some reason, apparently because the bag had wheels and he would not treat such a bag in a way that would cause it to get grass stains. Based on his curiosity, Keehn asked Gabriel, "What's in the bag?" without making any indication as to which of several bags he was referring to.

Gabriel then reached for a backpack resting on the floor of the front passenger compartment and responded, "clothes," or words to that effect.

Keehn then asked, "What's in the other bag?" again failing to indicate which bag he was referring to. This time, Gabriel began to reach for a duffle bag situated behind the front passenger seat and Keehn interjected, "No, not that bag. The hockey bag."

5

    Gabriel responded, "Just stuff."

  According to Keehn, when Gabriel reached for the duffle bag he reached over and across the hockey bag, suggesting that Gabriel was trying to ignore the presence of the hockey bag. According to Gabriel, however, the hockey bags were further back than the duffle bag and could not have been grabbed by him while he remained seat belted in the driver's seat. I credit Gabriel's testimony on this score. Agent McGrath's stipulated testimony reflects that both hockey bags were very large and were visible from the front of the car. The testimony also reflects that all of the vehicle's rear passenger seats were folded down. The size and visibility of the bags suggests that they were not positioned immediately behind Gabriel's seat, which would otherwise have tended to obscure the bags from an agent standing at Gabriel's window. All of the evidence is consistent, however, that the duffle bag Gabriel reached for was immediately behind the front passenger seat. Nevertheless, I fail to see how the appropriateness of Keehn's questioning about the contents of the hockey bag turns in any way on the issue of whether Gabriel reached over it while attempting to grab the duffle bag.

  According to Agent Keehn, following Gabriel's "just stuff" response, Keehn asked, "Do you mind if I look in the hockey bag?" According to Gabriel, Agent Keehn asked him, "Do you mind if I look in the bag?" once again failing to specify which bag he was referring to. According to both Gabriel and Agent Keehn, Gabriel said okay to having Keehn "look in the bag." However, Gabriel testified that after saying okay he reached for a different bag to give Agent Keehn, not to the hockey bag, but was prevented from limiting his consent to the bag of his choice when Keehn instructed him to exit the vehicle and lead him away from it. On this evidentiary issue I conclude that

6

Agent Keehn's testimony better captured the significance of what was said.  Based on the circumstances, I conclude that Agent Keehn made it plain to Gabriel that he was asking to look specifically in "the hockey bag," not any other bag, and that Gabriel understood that permission was being requested to look in the hockey bag.[6]

Agent Keehn then opened the van's side door and lifted up a hockey bag for inspection.  Upon opening the bag, Keehn saw plastic bags inside containing a leafy substance and took the hockey bag fully out of the van for a canine sniff.  The canine alerted within a minute or two.

## Discussion

Gabriel maintains that the marijuana seized from his possession on September 2, 2004, must be suppressed because the Old Town Checkpoint is nothing but a general checkpoint operating behind a border patrol front.  (Motion to Suppress, Docket No. 28, at 2-4.)  In addition, Gabriel maintains that, even if the checkpoint were valid, no facts were developed at the primary or secondary inspection area concerning any violation of immigration law and that there was no justification to continue to question Gabriel about matters unrelated to his immigration status.  (Id. at 5-6.)  Finally, Gabriel contends that he did not give the Government consent to search the hockey bag.  (Id. at 7.)  I begin my discussion with the question of whether the Government adduced sufficient evidence

---

[6]   Agent Keehn testified that he was not initially aware that there were two hockey bags in the car.  Keehn also testified that Gabriel's hands were shaking during the encounter and that Gabriel avoided making eye contact with the agent. I credit this testimony.  In addition, Agent Keehn testified that he was suspicious of the hockey bag because he had been made aware of certain "intelligence" concerning smuggling of drugs in large hockey bags, which testimony Agent Libby sought to corroborate in testimony solicited after defense counsel cross-examined Keehn. Agent Keehn made no mention in his report of his suspicions being heightened in any way by the presence of one or more hockey bags in the vehicle.  During cross examination, Agent Keehn also testified (1) that he had no indication that Gabriel was in the country illegally; (2) that there was no contraband in plain view; (3) that there was no odor of contraband or any masking smell coming from the vehicle; (4) that there was no information of past trafficking activity by Gabriel; (5) that Gabriel made no furtive or suspicious movements as he approached the secondary inspection area; and (6) that he had no basis to believe that anyone was hiding in the vehicle.

during the hearing to support a finding that the Old Town Checkpoint is a valid immigration checkpoint rather than an unconstitutional, general purpose roadblock. On that question, the Government's memorandum, like its evidence, is essentially limited to geographic concerns, safety reasons and the desire to minimize disruptions for the traveling public. (Gov't Resp., Docket No. 33, at 3.)

A.   *The Programmatic Purpose and Efficacy of the Old Town Checkpoint*

"A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000). However, the Supreme Court has "upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens." Id. (citing United States v. Martinez-Fuerte, 428 U.S. 543 (1976)). On the other hand, the Supreme Court has also held that brief, suspicionless seizures may not be conducted at checkpoints or roadblocks if they are primarily conducted for purposes of generalized crime prevention. Id. at 47. Whether a suspicionless seizure conducted by the government at a checkpoint is reasonable for purposes of the Fourth Amendment thus turns on the primary programmatic purpose for which the checkpoint is administered. Id. Although the Supreme Court has defined the constitutional standard for the courts to observe, it has not assigned the burden of proof on the issue of primary programmatic purpose, observing only that a court must examine all available evidence. Id. at 46-47. I conclude that the most appropriate placement of the burdens of "production" and of "persuasion" on the issue of programmatic purpose is with the government, at least in the context of a motion to suppress evidence in a criminal case.[7] See 3 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment, § 11.2(b) (West 1981) (characterizing the general

---

[7]   Edmond was a civil suit. 531 U.S. at 36.

federal rule that "if the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution").  See also United States v. Paradis, 351 F.3d 21, 27-28 (1st Cir. 2003) (citing LaFave); Edmond v. Goldsmith, 183 F.3d 659, 664-65 (7th Cir. 1999) (observing that Indianapolis "makes no attempt to defend its roadblocks"); cf. Edmond, 531 U.S. at 37 ("A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.")

In Martinez-Fuerte, the Supreme Court addressed "whether a vehicle may be stopped at a fixed [immigration] checkpoint for brief questioning of its occupants even though there is no reason to believe the particular vehicle contains illegal aliens."  428 U.S. at 545.  The Court held that "such stops are consistent with the Fourth Amendment." Id.  In light of the circumstances of the individual cases addressed in Martinez-Fuerte, the practical significance of the Court's holding is that no individualized suspicion is necessary in order to stop and divert a motorist for "brief questioning" concerning his or her residency and immigration status at fixed immigration checkpoints.  Id. at 566-67.  In rendering its opinion, the Court observed that the intrusion on an individual motorist's Fourth Amendment interests at such a checkpoint "is quite limited" because "all that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." Id. at 557-58.  On the other end of the scale, according to the Court, "the purpose of the stops is legitimate and in the public interest, . . . the need for this enforcement technique [having been] demonstrated by the records in the cases before [the Court]."  Id. at 562.  Those records demonstrated, among other things, that the checkpoints at issue, all of which were

9

near the U.S. border with Mexico, are located on "important highways" that "would offer illegal aliens [who snuck across the border] a quick and safe route into the interior," *and* that the checkpoints "apprehend many smugglers and illegal aliens who succumb to the lure of such highways." Id. at 557.  As for raw data, the record in one of the cases before the Court reflected that the San Clemente checkpoint in southern California, which in the 1970s was in operation about 70% of the time, led to the apprehension of some 17,000 illegal aliens in 1973, and that over an eight-day period the checkpoint yielded "725 deportable aliens in 171 vehicles." Id. at 554.[8]  These data and the Court's previous opinions both reflected that the "maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border." Id. at 556.[9]  Indeed, the Court indicated that "the flow of illegal entrants from Mexico poses formidable law enforcement problems." Id. at 552.[10]  Because of the enormity of the problem, the Court found that requiring border patrol agents to investigate immigration violations based on roving traffic stops supported by reasonable suspicion "would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens [and] would largely eliminate any deterrent to the conduct of well-disguised smuggling operations." Id. at 557.

---

[8]  Not all of the cases considered in the opinion had such data.  As for a Sarito, Texas, checkpoint, the Court indicated: "While it appears that fewer illegal aliens are apprehended there, it may be assumed that fewer pass by undetected, as every motorist is questioned." Id. at 554.

[9]  The Court elsewhere found that 85% of the 10-12 million illegal immigrants in the United States, circa 1976, "are from Mexico." Id. at 551.

[10]  See also Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 681 (1989) (discussing how, in Martinez-Fuerte, the Court "approved fixed [immigration] checkpoints near the Mexican border" based on "formidable law enforcement problems" related to "interdicting the flow of illegal entrants *from Mexico*") (Scalia, J., dissenting) (emphasis added); cf. United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) ("The Government makes a convincing demonstration that the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border.").

10

Maine, of course, shares an international boundary with Canada, not with Mexico. Nevertheless, the Supreme Court recognized in Martinez-Fuerte that immigration checkpoints might be appropriately operated at checkpoints along the northern interior near the Canadian border. Id. at 564 n.17. As to whether any such checkpoint would be reasonable under the Fourth Amendment, the Court indicated that "a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review," although the "choice of checkpoint locations must be left largely to the discretion of Border Patrol officials." Id. at 559 n.13. I have been unable to locate any cases subsequent to Martinez-Fuerte in which a court has reviewed a challenge to the reasonableness of a U.S. Border Patrol checkpoint operated anywhere along the northern interior. However, given the Supreme Court's characterization of an immigration checkpoint intrusion as "minimal," one would be inclined to suppose that the Government could readily make a case as to why the Old Town checkpoint should pass constitutional muster. Nevertheless, given the record established during my hearing on the defendant's motion to suppress, I consider this to be a very close case for two reasons:

(1)   The only testimony offered as to the Border Patrol's *purpose* for operating the Old Town checkpoint is that it was timed to coincide with the end of the agricultural season; and

(2)   The *only* data presented as to the efficacy of the checkpoint reflects that it produces more "incidental" or "general" violations than immigration violations.

As for the first concern, Agent Libby's testimony regarding programmatic purpose was virtually non-existent. According to Libby, the checkpoint was timed to coincide with

11

the end of the agricultural season.  However, he offered no testimony regarding the Maine agricultural season itself, the number of migrant workers participating in the fall harvest or the likelihood or number of illegal immigrants participating in it.  In other words, there is nothing in the record upon which the court might find that there exists any immigration "problem" that the checkpoint might reasonably be expected to redress.[11]  As for the second concern, even if there were sufficient evidence of a legitimate programmatic purpose, there is absolutely no way to review, on this record, whether the Old Town checkpoint actually advances the programmatic purpose because there is no evidence on that issue.  Instead, what the evidence reflects is that the checkpoint is not only designed to facilitate the apprehension of, but also primarily apprehends, individuals for general law violations.

In Edmond, the Supreme Court considered "the constitutionality of a highway checkpoint program whose primary purpose is the discovery and interdiction of illegal narcotics." 531 U.S. at 34.  The Court held the program unconstitutional based on the parties' stipulation to the fact that the seizures generated by the program were primarily meant to pursue "general crime control purposes." Id. at 48.  The Court was unwilling "to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes." Id. at

---

[11] The record is devoid of any testimony as to why the U.S. Border Patrol considers the operation of a one or two day checkpoint to be a reasonable means of apprehending illegal immigrant workers who, presumably, could be more readily apprehended at or near agricultural worksites, rather on I-95 just north of Bangor.  Furthermore, Agent Libby's suggestion that a September 2 checkpoint coincides with the end of the harvest does not have much persuasive force.  The roads that funnel into I-95 north of mile marker 199 come out of northern Penobscot, northern Washington and Aroostook County, where the primary crop is potatoes.  The potato season in Maine stretches from September into October.  It does not end at the beginning of September.  See http://www.mainerec.com/roostook.asp?Category=203&PageNum=203.  As for Maine's other primary crop, blueberries, the majority of the agricultural activity takes place in "Downeast" Maine, which consists primarily of Hancock and Washington Counties.  Traffic heading south from these operations would access I-95 via Route 1 or Route 9, well south of mile marker 199.

44. The Edmond opinion thus clearly establishes that police checkpoints, or roadblocks, are unconstitutional if the primary purpose behind their operation is generalized crime investigation. It also suggests that, for purposes of judicial review, a court should consider the primary purpose for which the government operates a given checkpoint. Id. at 46-47 (discussing the inquiry into "programmatic purpose"). However, the Edmond opinion ends by cautioning that the overriding factor, for purposes of determining the reasonableness of a checkpoint seizure under the Fourth Amendment, "still depends on a balancing of the competing interests at stake and the *effectiveness* of the program." Id. at 47 (citing Martinez-Fuerte, 428 U.S. at 556-64, and Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450-55 (1990)); see also Illinois v. Lidster, 540 U.S. 419, 427 (2004) ("[I]n judging reasonableness, we look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'") (quoting Brown v. Texas, 443 U.S. 47, 51 (1979), and also involving a roadblock scenario). It was for this reason that I pointedly asked Agent Libby during the hearing how many illegal aliens have been apprehended at the Old Town checkpoint, how many immigrant smugglers have been apprehended at the Old Town checkpoint and how many other immigration violations have been discovered as a consequence of the checkpoint's operation. Agent Libby, the Government's primary witness on the Border Patrol's Houlton sector checkpoint program, not only failed to provide any figures, but also failed even to state that the checkpoints produce any immigration-related arrests. Moreover, the Government's entire presentation appeared to be oriented exclusively to establishing that the checkpoint was safe and well-organized, that it was placed at a location where some state highways leading to the border funnel

13

into the interstate highway and that it was situated within 100 miles of several points-of-entry. With respect to this evidence, I conclude that there was nothing unreasonable in the way the Border Patrol structured or operated the checkpoint. However, on the issue of programmatic purpose (i.e., the "why" as opposed to the "how"), the court is left in the position of having to infer a legitimate immigration-related purpose primarily from the fact that the checkpoint is operated by the U.S. Border Patrol and, secondarily, from the fact that the checkpoint occurred in the fall, when agricultural migrant workers are present in Maine (the court has to take judicial notice of the fact that many Maine migrant workers are not American citizens, since there was no real evidence introduced concerning the composition of Maine's agricultural work force and I do not really have any personal knowledge about what percent of the agricultural workforce consists of illegal aliens). And on the crucial issue of checkpoint efficacy, there is even less evidence and none of it favors the Government. What the evidence reflects is that the Old Town checkpoint primarily produces general crime arrests. Presumably this is why the U.S. Border Patrol invites a group of state and county law enforcement officers to the secondary inspection area.[12] Their presence in the secondary inspection area has some tendency to suggest a general crime prevention purpose. In addition, there is a curious bit of information in the record regarding Agent McGrath's referral of Gabriel from the primary inspection area to the secondary inspection area. The stipulation as to McGrath's testimony reflects that the referral was not merely for a document check, but also, *ab initio*, for a "dog sniff." Although Border Patrol is free to lead a drug detection canine

---

[12] I recognize that the coordination of state and federal resources is not necessarily inappropriate. See, e.g., United States v. Barajas-Chavez, 236 F. Supp. 2d 1279 (D. N.M. 2002) (involving a joint operation at which INS agents participated at a "license and registration checkpoint" operated by the New Mexico State Police which resulted in the apprehension of some 60 illegal aliens in a single night). I merely observe that it is probative evidence of programmatic purpose.

around a car during a routine secondary immigration inspection, see Illinois v. Caballes, 125 S. Ct. 834, 847 (2005), assuming the process does not appreciably prolong the encounter,[13] persuasive precedent reflects that the systematic use of drug sniffing canines at checkpoints is probative of programmatic purpose. See Edmond v. Goldsmith, 183 F.3d 659, 665 (7th Cir. 1999) ("[T]he use of [a drug-sniffing dog] at the City's roadblocks shows . . . that the purpose of the roadblocks is to catch drug offenders."). Ultimately, when one considers "all the available evidence in order to determine the relevant primary purpose," Ferguson v. City of Charleston, 532 U.S. 67, 81 (2001), it is my conclusion that the Government has failed to carry its burden of establishing that the checkpoint seizure at issue in this case was reasonable under the Fourth Amendment.[14] In effect, although I recognize that the intrusion upon an individual's right to travel the highways "without interruption," Carroll v. United States, 267 U.S. 132, 154 (1925), is "minimal," Martinez-Fuerte, 428 U.S. at 560, the Government simply has not demonstrated that its operation of the Old Town checkpoint appreciably advances any legitimate public interest. Indeed, as for the public interest, the natural inference that should be drawn in view of the Fourth Amendment context is that the traveling public ought not be asked to endure checkpoint stops 15 miles north of Maine's most populous northern city (a service hub for northern Maine) unless the government can both articulate an appreciable public

---

[13]   In Martinez-Fuerte, the Supreme Court held that its holding was limited to "the type of stops described in [the] opinion" and that "any further detention . . . must be based on consent or probable cause." 428 U.S. at 567 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 882 (1975)). The opinion's recitation of facts describes only "brief questioning" concerning citizenship and immigration status. Id. at 545, 566-67.

[14]   I do not mean to suggest that the Old Town checkpoint is an unconstitutional checkpoint. My conclusion is, exclusively, that the Government failed to meet its burden on the issues of programmatic purpose and efficacy, which the law requires in the context of the defendant's motion to suppress. See the discussion, supra, regarding the unclear question whether the burden ultimately rests with the government.

interest (programmatic purpose) and demonstrate in some fashion that the public interest sought to be advanced is, in fact, advanced to some degree (efficacy).[15]

### B.   *Alternative Disposition*

In the event that the court rejects the foregoing recommendation and concludes that the seizure in this case satisfied the dictates of the Supreme Court's Fourth Amendment jurisprudence, then Gabriel's motion must be denied.  During the hearing, Gabriel conceded that the duration of the seizure was quite brief, at least up until the moment of his arrest.  Moreover, Martinez-Fuerte establishes that a referral to secondary inspection does not require any quantum of individualized suspicion.  428 U.S. at 560 (holding that the intrusion related to a secondary inspection referral "remains minimal").

Gabriel nevertheless maintains that, pursuant to Martinez-Fuerte, 428 U.S. at 567, and United States v. Portillo-Aguirre, 311 F.3d 647, 652 (5th Cir. 2003), that the government must have probable cause to justify "any further detention beyond a brief question or two or a request for documents."  (Def. Mem. of Law, Docket No. 28, at 5.) Gabriel argues that because a question concerning the contents of his bags took some quantum of time to express, he was unconstitutionally subjected to a prolonged detention. (Id.)  I reject this proposition because the Supreme Court has clearly authorized border patrol agents to seek to obtain consent to search based on something less than probable

---

[15]   The Government's presentation also suffers from the fact that it is difficult to conceptualize the Old Town checkpoint as the kind of "permanent and fixed checkpoint" that was at issue in Martinez-Fuerte. As of 1976, the San Clemente checkpoint was in operation roughly 70% of the time. 428 U.S. at 554.  One of the factors that the Supreme Court considered on the public interest side of the scale was the fact that "routine checkpoints" have only a minimal potential to interfere with legitimate traffic because motorists using the highway are "not taken by surprised as they know, or may obtain knowledge of, the location of the checkpoints."  Id. at 559.  The Old Town checkpoint, by comparison, is anything but known to the traveling public due to the fact that it is operated only a few days every year.  As a consequence, the local public is likely to be taken by surprise to come upon an immigration checkpoint in Old Town.  The reason I have not focused on this concern is that it is hard to imagine that it would be preferable to transform the Old Town checkpoint into a routine checkpoint.  With 9-10 agents committed to such an operation, one has to wonder whether a sufficient number of agents would be available to fully station the actual border.

16

cause. Martinez-Fuerte, 428 U.S. at 567 ("[C]heckpoint searches are constitutional only if justified by consent or probable cause."). Obviously, consent could never be obtained from an individual if an agent could not so much as take the time to verbalize the question that seeks consent. Because it is implicit in Martinez-Fuerte that an agent may verbalize a question seeking consent to search based on something short of probable cause, I conclude that he or she may also briefly prolong a seizure in order to verbalize a question about the contents of a vehicle when an encounter gives rise to articulable suspicion of other criminal activity. See United States v. Brignoni-Ponce, 422 U.S. 873, 881-882 (1975) ("The officer may question the driver and passengers about their citizenship and immigration status, *and he may ask them to explain suspicious circumstances*, but any further detention or search must be based on consent or probable cause."). *Viz.*:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.

Brignoni-Ponce, 422 U.S. at 881 (quoting Adams v. Williams, 407 U.S. 143 (1972)).[16]

The testimony elicited at the hearing demonstrates (1) that *questioning* concerning the contents of Gabriel's bags arose due to suspicions related to Gabriel's general nervousness, his shaking hands and his avoidance of eye-contact with Agent Keehn and (2) that the circumstances made it reasonable for Agent Keehn to conclude that Gabriel consented to a continued seizure and a search of the hockey bag. Reasonable suspicion has always set the standard for Terry-style seizures and questioning, not probable cause,

---

[16] Contrary to Gabriel's suggestion, the Fifth Circuit is in accord with this understanding. See United States v. Ellis, 330 F.3d 677, 680 (5th Cir. 2003) (holding that reasonable suspicion permits the brief prolongation of a programmatic seizure for investigations unrelated to the programmatic purpose).

17

and where reasonable suspicion justifies questioning it also justifies a request for consent to search. Consent having been attained, the ensuing search would not have offended the Fourth Amendment but for the concerns previously raised with regard to the operation of the checkpoint. Martinez-Fuerte, 428 U.S. at 567. Accordingly, in the event that the court rejects my primary recommendation, the appropriate disposition would be to deny the motion to suppress.

## Conclusion

For the reasons set forth herein, I **RECOMMEND** that the court **GRANT** Gabriel's motion to suppress (Docket No. 28.)

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated March 29, 2005