**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR-04-76-B-W |
| ) | |
| JOSHUA D. GABRIEL, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON MOTION TO SUPPRESS**

Joshua D. Gabriel, a Canadian citizen driving an SUV with New Jersey plates and two hockey bags containing leafs, not sticks, came upon a traffic checkpoint as he neared the city of Bangor, Maine over 70 air miles from the nearest port of entry. The United States Border Patrol had set up the temporary checkpoint just north of Bangor and after Mr. Gabriel was referred to secondary inspection, his bags were found to contain marijuana. He was arrested and indicted for an alleged violation of federal drug laws. He now challenges the constitutionality of this search. Concluding the search passes constitutional muster, this Court finds the Government's minimal intrusion was reasonable in light of the public interest at stake. This Court denies Defendant's motion to suppress.

**I.    Procedural History**

Joshua D. Gabriel was indicted on September 14, 2004 for the knowing and intentional possession of marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). (Docket # 11).[1] On November 5, 2004, Mr. Gabriel filed a motion to suppress and the Government responded on January 3, 2005. *Def.'s Mot. to Suppress Evid.* (Docket # 28)(*Def.'s Mot.*); *Gov.'s Resp. in Opp'n. to Def.'s Mot. to Suppress Evid.*

---

[1] The Grand Jury also charged Mr. Gabriel with forfeiture pursuant to 21 U.S.C. § 853(a) of a Rolex Perpetual DateJust 18k men's watch and $4,060.00.

(Docket # 33)(*Gov.'s Resp.*).  Upon referral under 28 U.S.C. § 636(b)(1)(B), Magistrate Judge Kravchuk held an evidentiary hearing on March 9, 2005 and issued a Report and Recommended Decision on March 29, 2005.  (Docket # 52)(*Rec. Dec.*).  Magistrate Judge Kravchuk concluded that the Government had not met its burden to show that the seizure withstood the strictures of the Fourth Amendment.  *Rec. Dec.* at 15.  She also determined, alternatively, that if the seizure were constitutional, the evidence should not be suppressed because the stop and referral to the secondary inspection area were minimally intrusive, there was reasonable suspicion to question the Defendant, and it was reasonable for the Agent to conclude that the Defendant consented to a continued seizure and search.  *Rec. Dec.* at 16-17.  Both parties objected (Docket # 58, 59), and this Court ordered a hearing, which was held on November 3, 2005.[2]

## II.   Factual Background[3]

---

[2] The evidence at the November 3, 2005 hearing included by stipulation the transcript of the March 9, 2005 hearing as well the presentation of additional evidence.  The Defendant elected to present no further testimony.  This Court affirms the Recommended Decision on the alternative disposition based on Magistrate Judge Kravchuk's findings of fact and conclusions of law as set forth in the Recommended Decision.  In describing these facts, this Court does so for background purposes; to the extent this recapitulation differs from the facts set forth in the Recommended Decision, this Court adopts those facts for purposes of its affirmation of the Magistrate Judge's alternative disposition.  Further, the Magistrate Judge concluded and this Court agrees that there was "nothing unreasonable in the way the Border Patrol structured or operated the checkpoint."  *Rec. Dec.* at 14.  Here, this Court's focus is on whether the Government failed to justify the purpose and prove the effectiveness of the temporary checkpoint.

[3] Although Defendant strenuously objects to this Court's consideration of new evidence, *Def.'s Resp. to Obj. to Report and Recommended Decision* at 2-3 (Docket # 62), the Court has authority to do so.  28 U.S.C. § 636(b)(1)(C); *United States v. Lawlor,* 324 F. Supp. 2d 81, 84 n.6 (D. Me. 2004), *aff'd by* 406 F.3d 37 (1st Cir. 2005).  This Court's review does not contemplate the consideration of arguments never seasonably raised before the Magistrate Judge.  *See Fireman's Ins. Co. v. Todesca Equip., Co.,* 310 F.3d 32, 38 (1st Cir. 2002)(quoting *Paterson-Leitch Co. v. Mass. Municipal Wholesale Elec. Co.,* 840 F.2d 985, 990-91(1st Cir. 1988)); *Borden v. Sec'y of Health & Human Servs.,* 836 F.2d 4, 6 (1st Cir. 1987)("Parties must take before the magistrate, 'not only their "best shot" but all of their shots.'")(quoting *Singh v. Superintending Sch. Comm.,* 593 F. Supp. 1315, 1318 (D. Me. 1984)).  Here, the Government presented evidence before the Magistrate Judge that it later determined was incorrect.  Relying on the accuracy of the erroneous evidence, the Magistrate Judge recommended the motion to suppress be granted.  There is no indication that the Government presented the erroneous evidence in bad faith or that it was seeking a strategic advantage before the Magistrate Judge.  *See Paterson-Leitch,* 840 F.2d at 991 (concerned with parties who "feint and weave at the initial hearing, and save…[the] knockout punch for the second round").  In these unusual circumstances, for this Court to base its ruling on mistaken evidence would only compound an error.

**A. The Search**

On September 2, 2004, Joshua D. Gabriel was traveling alone south on I-95 in a light blue Chrysler Pacifica SUV with New Jersey plates, when he came upon a Border Patrol checkpoint just north of Bangor, Maine.[4] After stopping his vehicle, Border Patrol Agent Christopher McGrath confirmed that Mr. Gabriel was a Canadian citizen and noticed two very large hockey bags in the rear passenger area of the automobile. He referred Mr. Gabriel from primary to secondary inspection for a document check and canine sniff.

When he reached secondary inspection, Mr. Gabriel was met by Senior Border Patrol Agent Keehn. Agent Keehn approached the blue SUV and addressed Mr. Gabriel through the open driver's side window. Mr. Gabriel identified himself as a Canadian citizen and gave Agent Keehn his driver's license. The back seats in the SUV were down and Agent Keehn noticed a large hockey bag in the back. He asked Mr. Gabriel where he was coming from and Mr. Gabriel replied that he had been checking out schools in Presque Isle, Maine. This struck Agent Keehn as odd since it was September and school had already started. Further, Mr. Gabriel seemed "kinda nervous" and avoided making eye contact.

Agent Keehn focused on the hockey bag in the back. He noticed the bag, which had wheels, had grass stains across the bottom as if it had been dragged across a lawn or field. Agent Keehn asked Mr. Gabriel what was in the bag without indicating which bag. In response, Mr. Gabriel reached onto the floorboard of the passenger seat and grabbed a backpack, telling Agent Keehn that it contained clothes. Agent Keehn then asked,

---

[4] As noted, this portion of the facts reiterates Magistrate Judge Kravchuk's factual findings, including her resolution of certain conflicts between the testimony of Agent Keehn and Mr. Gabriel. *See Rec. Dec.* at 4-7. This Court adopts the Magistrate Judge's resolution of those conflicts.

3

"What's in the other bag?", again, however, failing to state which bag. Mr. Gabriel retrieved a duffle bag behind the front passenger seat. Agent Keehn said, "No, not that bag. The hockey bag." Mr. Gabriel replied, "Just stuff." Agent Keehn asked if he could look into the hockey bag and Mr. Gabriel consented. The agent's inspection revealed the presence of marijuana. Mr. Gabriel was arrested and now stands charged with violating federal drug law.

### B. The Motion

In his motion, Mr. Gabriel attacks the constitutionality of the border checkpoint itself, noting that the checkpoint was not located at the border and arguing that the Old Town checkpoint was not the functional equivalence of a border. He further contends the "need for, location of and procedures employed" at the border checkpoint violated the Fourth Amendment. Mr. Gabriel argues that the initial referral from primary to secondary inspection and his continued questioning and detention there were without sufficient individualized suspicion. Finally, Mr. Gabriel claims his consent to the search of the vehicle was not voluntary, and the search was not otherwise justified. *Def.'s Mot.* at 1-2.

### C. The Recommended Decision

Based on the evidence at the March 9, 2005 hearing, Magistrate Judge Kravchuk recommended that Mr. Gabriel's motion be granted. Mr. Gabriel squarely placed at issue the Government's justification for the checkpoint and although the Government had produced evidence of the structure and operation of the checkpoint, the Magistrate Judge found the Government's evidence wanting on its programmatic purpose, "the 'why' as opposed to the 'how'", and on its efficacy. *Rec. Dec.* at 14. The Government produced a

4

paucity of evidence as to whether the checkpoint supported a "legitimate immigration-related purpose". *Id.* Border Patrol Agent Kai Libby testified that usually the Chief sets up the checkpoints to coincide with the presence of migrant farm workers at the end of the agricultural season. But, Magistrate Judge Kravchuk expressed no small amount of skepticism about whether a checkpoint on September 2 would have coincided with the end of any known agricultural season in Maine. *Id.* at 11-12, 14. Further, there was only a general reference to data to support the efficacy of the checkpoint: whether the checkpoint "actually advances the programmatic purpose…." *Id.* at 12.

Magistrate Judge Kravchuk was careful to note that she was not suggesting that the Old Town checkpoint was unconstitutional, only that the Government had "failed to meet its burden of proof on the issues of programmatic purpose and efficacy." *Id.* at 15 n. 14. If the checkpoint was constitutional, the Magistrate Judge concluded that all remaining issues, the initial stop, the referral to secondary inspection, reasonable suspicion for questioning, and consent, favored the Government. *Id.* at 16-18.

### D. The November 3, 2005 Hearing

At the November 3, 2005 evidentiary hearing, the parties stipulated into evidence the transcript of the March 9, 2005 suppression hearing and the Government presented an additional witness. Robert W. Gilbert, Chief Patrol Agent of the United States Border Patrol, Houlton, Maine, testified; Chief Gilbert oversaw Border Patrol activities in Maine and ordered the Old Town checkpoint. *Affidavit of Robert W. Gilbert* (Docket # 59 – Attach. 1). Chief Gilbert testified that the primary goal of the Border Patrol is "to apprehend terrorists and the weapons that illegally enter into the United States and also to deter any illegal entries… as well as contraband."

5

According to Chief Gilbert, the Border Patrol conducted the checkpoint as part of "Operation Ironclad – 04", a nationwide Border Patrol action to deal with the "threat of potential terrorist activity against the American people and other U.S. interests." *CBP/OBP Operation Ironclad – 04* (Gov. Ex. 4). *See also Operation Ironclad 04 Houlton Sector* (Gov. Ex. 6); *Situation 04-HQBOR-07-002* (Gov. Ex. 7).[5] The Ironclad mission was "to actively search for Weapons of Mass Effect, undocumented and Special Interest Aliens, smugglers of contraband and individuals that may have been of interest to other law enforcement agencies that participated in the operation". *After Action Report 04-HQBOR-07-002 Ironclad Phase II 2004, Old Town, Maine* (Gov. Ex. 9). Chief Gilbert noted that the President had elevated the threat level to Orange in December 2003 and the checkpoint was in part a Border Patrol response to the heightened threat level.

More specifically, there was a concern that terrorists could seek to disrupt the Democratic National Convention (DNC) and Republican National Party Convention (RNC). According to Chief Gilbert, the Border Patrol operated one checkpoint in Old Town from July 25-29, 2004 to coincide with the DNC, which was scheduled in Boston from July 26-29, 2004, and a second from August 28 through September 3, 2004, to coincide with the RNC, which was scheduled in New York City from August 30-September 2, 2004.[6] *Affidavit* at ¶13. Chief Gilbert testified:

---

[5] The exhibit numbers refer to those offered at the November 3rd hearing.

[6] The July checkpoint began the day before the DNC began and ended the day it ended; the August-September checkpoint began the two days before the RNC began and ended the day after it ended. Chief Gilbert did not explain why, if the purpose of the checkpoint was to afford security for the RNC, it was necessary to operate the checkpoint through the day after it ended. To infer from this unexplained fact, however, that terrorism was a pretext for the checkpoint is a leap too far. Mr. Gabriel was stopped at 11:40 a.m. on September 2, 2004 in Old Town, *Stipulation* (Gov. Ex. 1)*,* which would have allowed him enough time to reach New York City that evening, when President Bush was scheduled to address the Convention. *See* The White House, News & Policies, September 2004: "President's Remarks at the 2004 Republican National Convention"*, available at* http://www.whitehouse.gov/news/releases/2004/09/20040902-2.html (noting that President Bush began speaking at 10:08 p.m. EDT on September 2nd).

6

> "In making my decision, I considered the heightened level of national security during the Democratic and Republican National Conventions in the summer of 2004. The Republican National Convention was held in New York City from August 30, 2004 through September 2, 2004. Route 1-95 runs directly from the Canadian border through New England to New York City. Therefore, any alien entering the United States illegally across the Canadian-U.S. border in northern Maine during that time period would have a direct route by motor vehicle to New York City and would very likely pass through the immigration checkpoint at Old Town. I also took into consideration the availability of funding and manpower to operate the checkpoint at that time."

*Id.* at ¶13.

Phase I, the July checkpoint, resulted in eight apprehensions: seven foreign nationals and one United States citizen. Each foreign national was apprehended for an immigration-related violation; the United States citizen was arrested on an outstanding warrant. *After Action Report 04-HQBOR-07-002 Ironclad Phase I 2004, Old Town Maine* (Gov. Ex. 8). Phase II, the August – September checkpoint, resulted in the apprehension of seven persons: three aliens and four United States citizens. In addition to Mr. Gabriel, two Colombian nationals were apprehended on immigration violations. The four United States citizens included one apprehended on drug charges and three with outstanding warrants. *After Action Report Ironclad Phase II 2004.*

Although there was a special focus on terrorist activity, this was not the sole reason for the Old Town checkpoint. According to the United States Border Patrol Handbook, "the primary purpose of a traffic checkpoint operation is to apprehend illegal aliens and smugglers who have managed to evade apprehension at the border and are attempting to travel to interior locations". *United States Border Patrol Handbook: Chapter 13 – Traffic Checkpoint Operations* at 13.1 (Gov. Ex. 2) ("Handbook"). Chief Gilbert testified that given the ratio of agents to miles of border, checkpoints established "funnel points" to more effectively utilize manpower. Similarly, the Handbook provides

7

that the selection of a site should take into account "proximity to the confluence of two or more significant roads leading away from the border". *Id.* at 13.3.[7] Mile 199 is located below the convergence of Route 6, which connects with the Canadian border at Vanceboro, and Interstate 95, which connects with the border at Houlton and captures points north.[8]

The Border Patrol also relies on a deterrent effect from these checkpoints. The media often becomes aware of checkpoint operations and publicizes them, both in the United States and elsewhere, including Canada. This has the effect, in Chief Gilbert's words, of "pushing the border out", and "getting out the message that Maine is not going to be used for anybody that just decides to come through it wishing to do harm to the country."

Border Patrol checkpoints used several signs, cones and lights, and there are detailed procedures for setting up the physical arrangement and functioning of a checkpoint. *Handbook* at 13.4-13.5. The Old Town checkpoint followed these procedures for notifying the public of the upcoming stop. *Transcript of Proceedings as to Joshua D. Gabriel Hearing on Motion to Suppress held on 3/9/2005* at 12-15 (Docket # 57). The typical wait at the Old Town checkpoint was roughly five to ten minutes at most, and the questioning itself only took 10 to 15 seconds. *Id.* at 22. The Border Patrol

---

[7] The Border Patrol is also required to ensure that the checkpoint is far enough from the border to avoid interference with traffic in populated areas near the border (and beyond the 25 mile border zone in which border crossers are authorized); situated in terrain that restricts vehicle passage around the checkpoint; and, located on a stretch of highway compatible with safe operation. *Id*. The Old Town checkpoint was operated on a stretch of highway just north of a turn off for a truck weigh station, *Rec. Dec.* at 3-4, providing an opportunity for the secondary inspection area to operate with fewer traffic and safety concerns.

[8] At the November 3, 2005 hearing, the parties agreed this Court could take judicial notice of Maine geography. People who cross the United States border from western New Brunswick and Bas-Saint-Laurent, Quebec into the northeastern third of the state of Maine would be funneled into the Old Town checkpoint. For those who cross at or south of Jackman on the western border with Canada or at Calais on the eastern border, the likely route to New York City would run to the south of Old Town, avoiding the checkpoint.

8

did the initial screening and state police and county sheriffs were posted at the secondary screening. *Rec. Dec.* at 3-4.

### III. Discussion

The Fourth Amendment of the United States Constitution reads:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The peoples' "right to be secure" has long been interpreted to include the "a right to free passage without interruption or search unless there is… probable cause for believing that their vehicles are carrying contraband or illegal merchandise." *Carroll v. United States,* 267 U.S. 132, 154 (1925).

The right of free passage does not, of course, apply to border crossings into this country. In *United States v. Flores-Montano,* 541 U.S. 149 (2004), the Supreme Court wrote that the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. Time and again, we have stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" *Id.* at 152-53 (quoting *United States v. Ramsey,* 431 U.S. 606, 616 (1977)). If the search of Mr. Gabriel's vehicle had taken place when he crossed the border, it would have been unquestionably constitutional. As the individual moves away from the border, however,

the "right of the sovereign to protect itself" becomes constrained by the right of the people "to free passage." In a series of nuanced decisions, the United States Supreme Court has developed a body of decisional law, which defines the contours of these conflicting rights.[9]

### A. Interior Border Patrol Searches: Statutory and Regulatory Law

Before reaching the constitutional issue, however, the first question is whether the Border Patrol has the authority to operate a checkpoint so far into the interior of the United States. It does. Congress has entrusted the Border Patrol with broad search and seizure powers. 8 U.S.C. § 1357. The Border Patrol is authorized without warrant to "board and search for aliens… any vehicle" so long as the vehicle is "within a reasonable distance from any external boundary of the United States," § 1357(a)(3), and to make arrests "for any felony cognizable under the laws of the United States, if the officer… has reasonable grounds to believe that the person to be arrested has committed or is committing such felony…." § 1357(a)(5)(B). Federal regulations define "external boundary" to include "the land boundaries and the territorial sea of the United States extending 12 nautical miles from the baselines of the United States determined in accordance with international law." 8 C.F.R. 287.1(a)(1). "Reasonable distance", as used in § 1357, means "within 100 air miles from any external boundary of the United States or any shorter distance which may be fixed by the chief patrol agent…." § 287.1(a)(2). The Old Town checkpoint was within 100 air miles of the Canadian border and the Border Patrol's search and seizure of Mr. Gabriel's contraband was clearly within

---

[9] The detention in this case was a seizure within the meaning of the Fourth Amendment. *City of Indianapolis v. Edmond,* 531 U.S. 32, 40 (2000); *Delaware v. Prouse,* 440 U.S. 648, 653 (1979); *United States v. Martinez-Fuerte,* 428 U.S. 543, 556 (1976).

its statutory and regulatory authority.[10]   No Act of Congress, however, "can authorize a violation of the Constitution."  *United States v. Brignoni-Ponce,* 422 U.S. 873, 877 (1975)(quoting *Almeida-Sanchez v. United States,* 413 U.S. 266, 272 (1973)); *United States v. Dusablon,* 534 F. Supp. 1368, 1374 (D. Me. 1982).  This Court, therefore, turns to the constitutional issue.

### B.  Traffic Stops and the Fourth Amendment

In *Carroll,* the Supreme Court reviewed the historical distinction between a search of a home and a vehicle.  *Carroll,* 267 U.S. at 153.  Noting it is "not practicable to secure a warrant" for a vehicle, because it "can be quickly moved out of the locality or jurisdiction in which the warrant must be sought", *Carroll* reaffirmed the probable cause requirement for vehicles "lawfully within the country."  *Id.* at 153-54.  Consistent with the *Carroll* doctrine, the Supreme Court held a stop and detention solely to check a driver's license and registration to be violative of the Fourth Amendment, but went on to say that its holding "does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion.  Questioning of all oncoming traffic at roadblock-type stops is one possible alternative."  *Delaware v. Prouse,* 440 U.S. 648, 663 (1979).  In *Mich. Dep't of State Police v. Sitz,* 496 U.S. 444 (1990), the Supreme Court upheld the constitutionality of sobriety checkpoints, concluding that the "balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be

---

[10] For some states, the 100-mile limitation has an unusually broad reach.  Maine, for example, is the only state that borders only one other state; it also has a long, indented coastline.  Under 8 C.F.R. § 287.1(a)(2), the entire state of Maine might be subject to Border Patrol checkpoints.  What would not be covered by the limitation of 100 miles from the border would likely be included within 100 miles of the territorial sea. The same may be true of other states, like Florida.

said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." *Id.* at 455.

In *City of Indianapolis v. Edmond,* 531 U.S. 32 (2000), however, the Supreme Court set a limit to the use of checkpoints.[11] In *Edmond,* law enforcement officers stopped a pre-determined number of vehicles, advised the driver they had been stopped at a drug checkpoint, asked for a license and registration, looked for signs of impairment, conducted an open-view examination of the vehicle, and used a narcotics detection dog to sniff the exterior of the vehicle. *Edmond* noted that the Supreme Court had "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion." *Id.* at 41.

Finally, in *Illinois v. Lidster,* 540 U.S. 419 (2004), the Supreme Court addressed a checkpoint that police had established to obtain information about a hit-and-run accident that had occurred the week before and resulted in death. The police set up the checkpoint about one week after the accident at about the same date and time and the occupants of the vehicle were asked whether they had any information about the accident. After being stopped at the checkpoint, the defendant was arrested and ultimately convicted of operating under the influence of alcohol. *Lidster* upheld the constitutionality of the checkpoint, distinguishing *Edmond* by noting that the "primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask

---

[11] In *Almeida-Sanchez v. United States,* 413 U.S. 266 (1973), the Supreme Court cautioned that the "*Carroll* doctrine does not declare a field day for the police in searching automobiles." *Id.* at 269.

vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others." *Id.* at 423 (emphasis in original).

Applying this series of precedents, if this checkpoint had been operated by the state police for purposes of general criminal deterrence, it would not have passed constitutional muster. This was neither a *Sitz* sobriety checkpoint nor a *Lidster* criminal investigation. But for its Border Patrol aegis, it would have been more like an *Edmond* checkpoint to ferret out ordinary criminal wrongdoing. The question becomes whether its operation by the Border Patrol takes the checkpoint outside the normal search and seizure limitations of the Fourth Amendment.

### C. Interior Border Patrol Searches: The Fourth Amendment

The United States Supreme Court has explored the constitutionality of interior searches by the Border Patrol and its decisions inform and control the resolution of this motion. To be clear, this discussion is not about the authority of the Government to perform searches at the border or their functional equivalents.[12] To paraphrase Chief Gilbert, the question is only about the constitutional implications of "pushing the border in" and conducting Border Patrol operations well inside the territorial borders of the United States.

The type of operation is important. In addition to border checkpoints, the United States Border Patrol uses three types of inland-checking operations to minimize illegal immigration: permanent checkpoints, temporary checkpoints, and roving patrols. The

---

[12] In *Almeida-Sanchez v. United States,* 413 U.S. 266, 272-73 (1973), the Court clarified that "routine border searches" may take place "not only at the border itself, but at its functional equivalents as well." It gave examples of "searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border" or "at a St. Louis airport after a nonstop flight from Mexico City". *Id.* at 273. Likewise, the First Circuit recently provided examples of an airport prior to a package being sent overseas or a post office where incoming international mail is processed. *United States v. Momoh,* 427 F.3d 137, 143 (1st Cir. 2005). There is no evidence the Old Town checkpoint was the "functional equivalent" of the border.

13

Supreme Court has addressed roving patrols. *United States v. Arvizu,* 534 U.S. 266 (2002); *United States v. Cortez,* 449 U.S. 411 (1981); *Almeida-Sanchez v. United States,* 413 U.S. 266 (1973); *United States v. Brignoni-Ponce,* 422 U.S. 873 (1975). In *Almeida-Sanchez,* the Border Patrol Agent stopped and searched the vehicle of a Mexican motorist about 25 air miles north of the Mexican border. There was no search warrant, no probable cause, and no reasonable suspicion for the stop. *Id.* at 268. The Court concluded that in the "absence of probable cause or consent, that search violated the petitioner's Fourth Amendment right to be free of 'unreasonable searches and seizures.'" *Id.* at 273.

In *Brigoni-Ponce,* the Supreme Court applied a "reasonable suspicion" standard to roving patrol stops: "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonable warrant suspicion that the vehicles contain aliens who may be illegally in the country." 422 U.S. at 884. Although full blown searches at inland Border Patrol checkpoints and by roving patrols must be supported by consent or probable cause, *United States v. Ortiz,* 422 U.S. 891, 896-97 (1975), the Supreme Court has reiterated that lesser intrusions by inland roving patrols need be supported only by a reasonable suspicion, that is the officer must have a "'particularized and objective basis' for suspecting legal wrongdoing" given the totality of the circumstances." *Alvizu,* 534 U.S. at 273 (quoting *Cortez,* 449 U.S. at 417-18). *See United States v. Singh,* 415 F.3d 288, 293-95 (2d Cir. 2005).

The result, however, is different for permanent checkpoints. In *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976), the Supreme Court upheld the constitutionality of

14

an interior Border Patrol traffic checkpoint located between San Diego and Los Angeles 66 road miles north of the Mexican border. *Id.* at 545.[13]  In *Martinez-Fuerte,* the Supreme Court engaged in an extensive discussion of border security problems with Mexico, marshalling an impressive set of statistics that attest to what it characterized as "formidable law enforcement problems." *Id.* at 552-54. *Martinez-Fuerte* determined that a brief, suspicionless seizure of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens imposed a "quite limited" intrusion on Fourth Amendment interests in light of the "great" need to detect "smugglers and illegal aliens". 428 U.S. at 556-558.

Distinguishing between roving patrols and checkpoints, the Supreme Court noted in *Ortiz* that the "circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints, the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *Martinez-Fuerte,* 428 U.S. at 558 (quoting *Ortiz,* 422 U.S. at 894-95). *Martinez-Fuerte* observed that "[r]outine checkpoint stops do not intrude similarly on the

---

[13] As well as a second permanent checkpoint on U.S. Highway 77 near Sarita, Texas, which "originates in Brownsville and…is one of the two major highways running north from the lower Rio Grande valley. The Sarita checkpoint is about 90 miles north of Brownsville, and 65-90 miles from the nearest points of the Mexican border". *Id.* at 549-50. It is worth comparing the two checkpoints to the one in Old Town. No question was raised about the reasonableness of the location of the Sarita checkpoint, *id.* at 563; however, the Supreme Court was given the opportunity to address the reasonableness of the San Clemente location. In justifying the choice of that location, the Border Patrol relied on the same factors utilized in designing the Old Town checkpoint: distant enough from the border to avoid interference with traffic; near the confluence of two or more significant roads; situated in terrain restricting vehicle passage; and, on a stretch of highway compatible with safe operation. *Id.* at 553. The Court also noted that "the choice of checkpoint locations must be left largely to the discretion of Border Patrol officials". *Id.* at 559 n.13. Given that the Old Town checkpoint is a comparable distance away from the border (within statutory and regulatory authority), and was sited based on comparable factors, there is no basis to distinguish the Old Town checkpoint merely on its physical location from the checkpoint in San Clemente, approved by the Supreme Court.

motoring public." *Id.* at 559. The Court concluded that "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant." *Id.* at 566.

### D. The Old Town Temporary Checkpoint

Here, the Border Patrol relies not only on the need to detect smugglers and illegal aliens, but also its intent to search for "weapons of mass effect" and the terrorists who may carry them – concerns far more weighty in 2004 than in 1976. In addition, this checkpoint was scheduled in part to protect the security of the American political process and the essential work of party nomination.

Admittedly, the manifest need for Border Security checkpoints in Maine is no doubt lessened by the fact that far fewer illegal aliens pass through the Canadian border into Maine than through the Mexican border into southern California. *Martinez-Fuerte* mentioned that at the San Clemente checkpoint, 17,000 illegal aliens were apprehended during a single year. *Id.* at 554. That averages out to a rate of roughly 46 aliens a day – compared to the three apprehended at the Old Town checkpoint over the course of a week. *Edmond* also confirms that *Martinez-Fuerte* was concerned with the problems "posed by the northbound tide of illegal immigrants into the United States", and cites cases dealing with the United States-Mexican border. 531 U.S. at 38.

Nevertheless, the "procedural protections of the Constitution protect the guilty as well as the innocent", *Minnick v. Mississippi,* 498 U.S. 146, 166 (1990)(Scalia, J., dissenting), and it is both guilty and innocent motorists the law must consider in reflecting upon constitutional applications. The motorist in San Clemente deserves the protections of the Fourth Amendment no less than the motorist in Old Town and it is

16

difficult to envision or justify differing regional standards for the application of Fourth Amendment protections. This is despite *Martinez-Fuerte*'s suggestion that some balancing must be made in determining whether a checkpoint seizure violates the Fourth Amendment – between governmental need and individual burdens – a test which implies some sort of factual inquiry. *See also Prouse,* 440 U.S. at 654 ("The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests"); *accord United States v. Burke,* 716 F.2d 935, 938 (1st Cir. 1983).

Magistrate Judge Kravchuk noted that "during the hearing, Gabriel conceded that the duration of the seizure was quite brief, at least up until the moment of his arrest". *Rec. Dec.* at 16. For several reasons, this Court determines that while the burden on Fourth Amendment rights remains small, the governmental need remains great. First, the articulated need encompasses not merely illegal aliens, but "weapons of mass effect" and "special interest aliens". The United States-Canadian border is over twice as long as the United States-Mexican border, and likely presents as enticing an opportunity for smuggling weapons of mass effect or for individuals bent on destruction. More specifically, given that the perceived threat to the northeastern cities of New York and Boston, where the party conventions were held, the Canadian border presented an appealing point of entry.[14]

---

[14] Tragically, the state of Maine as a taking off point for terrorist activities is all too familiar to the people of this country. The images of Mohamed Atta al-Sayed and his cohorts passing through airport security in Portland, Maine in the early morning hours of September 11, 2001 remain a chilling reminder that this country is only as secure as its most vulnerable point. This case is one of many where a balance must be struck between the Government's obligation to protect its citizens and its citizens' right to be protected from the Government. Whatever the correct balance, this task is made all the more difficult and all the more essential by the horrific events of 9-11. The use of a commercial passenger aircraft as a weapon

There is no evidence the Border Patrol was using terrorism as a pretext to operate a checkpoint otherwise forbidden by *Edmond*. It is true that in the August – September 2004 checkpoint resulted in more arrests of United States citizens than aliens and that state law enforcement officers assisted in manning the secondary inspection area. However, as Magistrate Judge Kravchuk noted, the "coordination of state and federal resources is not necessarily inappropriate." *Rec. Dec.* at 14 n.12. *See United States v. Barajas-Chavez,* 236 F. Supp. 2d 1279 (D.N.M. 2002), *aff'd on other grounds* 358 F.3d 1263 (10th Cir. 2004), *cert. denied* 125 S. Ct. 283 (2004). It is also true that the spectre of terrorism cannot be allowed to drive constitutional analysis without losing our freedoms in the effort to protect them. Nevertheless, however significant this tension may be in other contexts, there is no direct evidence that the threat of terrorism against the party conventions was anything but real and required heightened vigilance.[15]

The temporary nature of the Old Town checkpoint does not make a constitutional difference. *Martinez-Fuerte* addressed a permanent checkpoint and its permanence may add weight to the Court's conclusions about the impact on the ordinary motorist. Nevertheless, the Supreme Court approved temporary sobriety checkpoints in *Sitz* and *Lidster*, *see Mollica v. Volker,* 229 F.3d 366, 369 (2d Cir. 2000), and the Old Town checkpoint had the attributes that the Supreme Court deemed significant in *Martinez-Fuerte* and *Ortiz*. *See infra* n.16.

Further, other courts have applied *Martinez-Fuerte* in equal measure to the northern border. *United States v. Sugrim,* 732 F.2d 25, 29 (2d Cir. 1984); *United States v. Johnson,* No. 01-CR-259, 2001 U.S. Dist. LEXIS 16973 (N.D.N.Y. Oct. 18, 2001);

---

resulted in a greater public tolerance for searches at domestic airports. Mercifully, the use of a private motor vehicle as a weapon has not yet tested the public or the courts.

[15] *But see supra* n. 6.

*United States v. Whitmore,* 536 F. Supp. 1284, 1292 n.11 (D. Me. 1982)(applying *Martinez-Fuerte* to Coast Guard stop in coastal waters of Maine). *See also Dusablon,* 534 F. Supp. at 1374 (applying *Cortez* to a Border Patrol stop in northern Maine).[16]

This Court concludes that the Border Patrol's temporary checkpoint in Old Town on September 2, 2004 passes constitutional muster under the United States Supreme Court's holding in *Martinez-Fuerte* and its progeny.

### E. The Secondary Inspection Area

The remaining issues are whether the referral to the secondary inspection area, continued questioning and detention there, and subsequent search of the vehicle were constitutional. Magistrate Judge Kravchuk addressed each of these matters in her "Alternative Disposition". *Rec. Dec.* at 16. This Court has reviewed and considered the Magistrate Judge's Alternative Disposition together with the entire record, and has made a de novo determination of all matters adjudicated by the Magistrate Judge's "Alternate Disposition" in her Recommended Decision. This Court concurs with the recommendations of the United States Magistrate Judge for the reasons set forth in the "Alternative Disposition" and determines that no further proceeding is necessary.

1. It is therefore ORDERED that the "Alternative Disposition" of the Recommended Decision of the Magistrate Judge is hereby AFFIRMED.

2. It is further ORDERED that Defendant's Motion to Suppress (Docket # 28) is hereby DENIED.

### IV. Conclusion

Defendant's motion to suppress is DENIED.

---

[16] In *Johnson,* Judge Hurd relied on the following factors to characterize the stop as a temporary checkpoint rather than a roving patrol: 'First, the checkpoint was established at a fixed location that was used on repeated occasions by the Border Patrol. Second, the location of the checkpoint was announced by traffic control devices - including signs, lights, and traffic cones. Third, the checkpoint was not established to intercept any particular individual." 2001 U.S. Dist. LEXIS 16973 at *6. These factors apply equally here.

**SO ORDERED.**

                                               /s/ John A. Woodcock, Jr.
                                               JOHN A. WOODCOCK, JR.
                                               UNITED STATES DISTRICT JUDGE

Dated this 5th day of December, 2005